UNITED STATES of America,
Plaintiff–Appellee,

v.

Michael Anthony THURMOND,
Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Michael Dwayne HARRIS,
Defendant–Appellant.

Nos. 92–3344, 92–3356.

United States Court of Appeals,
Tenth Circuit.

Oct. 15, 1993.

David J. Phillips, Asst. Federal Public Defender (Charles D. Anderson, Federal Public Defender, with him on the brief), Kansas City, KS, for appellant Thurmond.

James T. George, Lawrence, KS, for appellant Harris.

Robert S. Streepy, Asst. U.S. Atty. (Jackie N. Williams, U.S. Atty. with him on the brief), Kansas City, KS, for appellee U.S.

Before BALDOCK, FEINBERG,* and BRORBY, Circuit Judges.

---

* The Honorable Wilfred Feinberg, Senior United States Circuit Judge for the United States Court of Appeals–Second Circuit, sitting by designation.

BALDOCK, Circuit Judge.

Defendants Thurmond and Harris[1] were convicted of knowingly and intentionally distributing approximately six grams of cocaine base. 21 U.S.C. § 841(a)(1); 18 U.S.C. 2. Thurmond was sentenced to 87 months imprisonment, and Harris received a sentence of 97 months imprisonment. Harris appeals his conviction, and both Defendants appeal the district court's denial of their motion to rehear Defendants' Motion to Declare the Sentencing Provision of 21 U.S.C. § 841(b)(1)(B) and 2D1.1 of the Sentencing Guidelines as to Cocaine Base Unconstitutional.[2] Defendants claim that these provisions violate their rights to equal protection and due process. We have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

On February 6, 1992, Special Agent Alex McCauley, working undercover, accompanied a confidential informant ("CI") to Harris's residence in Kansas City, Kansas where the CI introduced McCauley to Harris. McCauley asked Defendant Harris whether he would be interested in purchasing a firearm from McCauley. During this conversation, McCauley noticed a substance on a table in front of Defendant Harris's chair which he believed was cocaine base and asked Defendant Harris if he could buy some "crack" (slang term for cocaine base). Defendant Harris sold him three baggies of cocaine base weighing a total of 0.2 grams. McCauley also asked if he could purchase a quarter ounce of crack, and Defendant Harris told McCauley to return in thirty minutes to make the purchase.

Approximately forty minutes later, McCauley returned to Harris's residence and again asked to purchase a quarter ounce of crack. Harris responded, "I've got it over at my other house." Harris then stated that "my man," referring to Thurmond, who was also present at the residence, would take McCauley to Harris's other house. Harris told

McCauley that the purchase price for the quarter ounce would be $450.00.

McCauley and Thurmond then traveled to a residence located at 242 N. Eighth Street, Kansas City, Kansas. While McCauley waited in the car, Thurmond entered the house. After a short period of time, Thurmond returned to the car with six grams of cocaine base which he gave to McCauley; McCauley in return paid Thurmond.

On the next day, a search warrant was obtained to search Harris's residence. Among the items recovered was $80.00 in United States currency. Through the use of serial numbers, it was determined that $40.00 recovered from Harris was from money McCauley paid Thurmond for the quarter ounce of cocaine base.

Defendants were tried jointly. At the conclusion of the government's case, Defendants moved for a judgment of acquittal, which the district court denied. At the conclusion of all the evidence, the jury convicted Defendants of distributing approximately six grams of cocaine base.

Prior to sentencing, Thurmond filed a motion to declare the sentencing provisions regarding cocaine base unconstitutional as discriminatory against African–Americans. Thurmond joined the motion, and the district court, after conducting a hearing on the matter, denied the motion. Defendants then filed a motion for rehearing, which the district court also denied.

I.

Harris appeals his conviction, asserting that there was insufficient evidence from which the jury could conclude that Harris aided and abetted the distribution of six grams of cocaine base. Harris asserts that there is no evidence that Harris took any action to assist Thurmond in conducting the

---

1. Defendants' appeals are not consolidated. However, because Defendants raise a common issue, we address both appeals in a single opinion.

2. Defendant Harris also filed a motion to set aside his sentence pursuant to 28 U.S.C. § 2255.

Because § 2255 motions are inappropriate, absent extraordinary circumstances, if the movant is simultaneously pursing a direct appeal, *United States v. Cook*, 997 F.2d 1312, 1318–19 (10th Cir.1993), we dismiss Defendant Harris's § 2255 motion.

sale of six grams of cocaine base to McCauley. We disagree.

In criminal cases, we apply a single test to review the sufficiency of the evidence. *United States v. Sides*, 944 F.2d 1554, 1557 (10th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 604, 116 L.Ed.2d 627 (1991). "The evidence—both direct and circumstantial, together with the reasonable inferences to be drawn therefrom—is sufficient if, when taken in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt." *Id.* (citation omitted). We will not set aside a jury verdict that is supported by substantial evidence. *Id.*

In an aiding and abetting case, the government must prove that the defendant shared in the intent to commit the offense, as well as participated in some manner to assist its commission. *United States v. King*, 936 F.2d 477, 481 (10th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 647, 116 L.Ed.2d 664 (1991). The government may establish the required "association" with the criminal venture by circumstantial evidence. *United States v. Johnson*, 911 F.2d 1394, 1399 (10th Cir.1990), *cert. denied*, 498 U.S. 1050, 111 S.Ct. 761, 112 L.Ed.2d 781 (1991). Even "evidence of relatively slight moment may warrant a jury's finding of participation." *United States v. Zamora*, 784 F.2d 1025, 1031 (10th Cir.1986).

Applying these standards to the facts in the instant case, we hold that there was sufficient evidence from which the jury could conclude beyond a reasonable doubt that Harris aided and abetted the distribution of six grams of cocaine base. Harris had sold cocaine base to McCauley earlier in the day, and then, when McCauley asked Harris if he could sell him a quarter ounce, Harris responded "I've got it over at my other house." Harris explained that his "man" Thurmond would take McCauley to Harris's other house. Thurmond did so, and the sale was completed. Moreover, prior to leaving for Harris's other house, Harris quoted the purchase price of the cocaine base to McCauley, and $40.00 from that transaction was found on the person of Harris the following day. The jury could easily have concluded that the

evidence of Harris's statements to McCauley of where the cocaine base could be found, how McCauley could get there, how much the cocaine base would cost, as well as Harris's possession of proceeds from the sale of the cocaine base, indicated that Harris shared in the intent to bring about the transaction, and sought to make the sale succeed "by some action on his part." *King*, 936 F.2d at 481.

## II.

Defendants appeal the district court's denial of their motion to rehear Defendants' Motion to Declare the Sentencing Provision of 21 U.S.C. § 841(b)(1)(B) and 2D1.1 of the Sentencing Guidelines as to Cocaine Base Unconstitutional. Defendants claim that these provisions violate their Fifth Amendment rights to due process and equal protection.

The court denied Defendants' motion concluding that neither Congress nor the Sentencing Commission enacted the cocaine base provisions, nor left them in place, to further a racially discriminatory purpose. The court found that Defendants' statistics concerning the District of Kansas—*i.e.*, that 97% of all persons charged with distribution of cocaine base in Kansas between 1988 and 1992 were African–American—were inconclusive. The court also denied the motion because Defendants provided no statistics concerning the percentage of whites charged with distribution of cocaine powder.

The district court then denied Defendants' motion for rehearing on the matter. *See United States v. Harris*, 809 F.Supp. 843 (D.Kan.1992). In support of this motion, Defendants offered evidence that 95% of federal cocaine base prosecutions are brought against African–Americans while 40% of federal cocaine powder prosecutions are brought against whites. In response to these national statistics, the district court required an evidentiary showing from the government regarding Congress's reasons, other than race, for imposing more severe penalties for offenses involving cocaine base than offenses involving powder cocaine. Upon receiving additional evidence from the government, the court denied Defendants' motion for rehear-

ing. In its denial, the court stated that even if it were to conclude that the statistics alone could support an inference of discriminatory intent, it was persuaded by the government's evidence that Congress enacted the more severe penalties for cocaine base offenses for reasons other than race—*i.e.*, the highly addictive nature of cocaine base, its widespread availability, and its relatively low cost.

■ Defendants argue that their national statistics, which indicate that 95% of federal cocaine base prosecutions are brought against African–Americans while 40% of federal cocaine powder statistics are brought against whites, are so stark, that this case is one of those rare cases, similar to *Shaw v. Reno*, —— U.S. ——, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993), *Gomillion v. Lightfoot*, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960) and *Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886), wherein statistical evidence alone is enough to prove that Congress had a racially discriminatory purpose in enacting the provisions, as well as in leaving them intact.[3] Alternatively, Defendants argue that the statistics combined with Senator D'Amato's reference to "ghettos" in statements he made in support of the Anti–Drug Abuse Act of 1986, are evidence of Congress's discriminatory purpose. *See* 132 Cong.Rec. S8092 (daily ed. June 20, 1986).

In the Anti–Drug Abuse Act of 1986, Congress amended 21 U.S.C. § 841(b)(1) to provide for enhanced penalties for offenses involving specified amounts of controlled substances. *See* P.L. 99–570, § 1002(2), 100 Stat. 3207 (1986); *see also United States v. Easter*, 981 F.2d 1549, 1557 (10th Cir.1992). As a result, 21 U.S.C. § 841(b)(1) and the corresponding Sentencing Guideline, U.S.S.G. § 2D1.1, impose a significantly

greater penalty for offenses involving cocaine base than for offenses involving other forms of cocaine. Under the sentencing scheme of 21 U.S.C. § 841(b)(1) and U.S.S.G. § 2D1.1, one gram of cocaine base is treated the same as one hundred grams of cocaine powder.[4]

■ At the outset, we uphold the district court's rejection of Defendants' arguments to the extent they challenge 21 U.S.C. § 841(b)(1) and U.S.S.G. § 2D1.1 on due process grounds. In *United States v. Turner*, 928 F.2d 956 (10th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 230, 116 L.Ed.2d 187 (1991), we specifically held that the enhanced penalty scheme for offenses involving cocaine base does not violate due process, *id.* at 960, and in *Easter*, 981 F.2d at 1557, we held that 21 U.S.C. § 841(b)(1) and U.S.S.G. § 2D1.1 are not void for vagueness.

Every Circuit that has addressed the issue has upheld the constitutionality of 21 U.S.C. § 841(b)(1) and U.S.S.G. § 2D1.1 against race-based equal protection challenges. *See e.g., United States v. Reece*, 994 F.2d 277, 278–79 (6th Cir.1993); *United States v. Frazier*, 981 F.2d 92, 94–95 (3d Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1661, 123 L.Ed.2d 279, *and* —— U.S. ——, 113 S.Ct. 1662, 123 L.Ed.2d 281 (1993); *United States v. Galloway*, 951 F.2d 64, 65–66 (5th Cir. 1992); *United States v. House*, 939 F.2d 659, 664 (8th Cir.1991). Similarly, in *Easter*, 981 F.2d 1549, we rejected an equal protection challenge to the identical enhanced penalty provisions. *Id.* at 1558–59. In that case, the defendant relied on statistics cited in a Minnesota Supreme Court case that, in 1988, 96.6% of those arrested under Minnesota law for possession of cocaine base were African–American, while 79.9% of those arrested for possession of cocaine powder were white. *Id.* at 1559 n. 8 (citing *State v. Russell*, 477

---

**3.** Harris also relies on a rather equivocal inference the district court drew from Defendants' statistics that Congress acted with discriminatory purpose. *See Harris*, 809 F.Supp. at 845 & n. 5. Because the court applied the inference, Harris argues, the government was required to prove that the sentencing scheme is necessary to achieve a compelling government interest. To the extent the court actually did permit an inference of discriminatory purpose, we disagree. *See infra* (concluding that Defendants' statistics are insufficient to prove discriminatory purpose).

Consequently, we do not reach Harris's argument concerning whether the government has shown that the sentencing scheme for cocaine base is necessary to serve a compelling interest.

**4.** For example, 21 U.S.C. § 841(b)(1)(B) and U.S.S.G. § 2D1.1 mandate the same sentence for offenses involving five grams of cocaine base, as they do for offenses involving 500 grams of cocaine powder.

N.W.2d 886, 888 n. 1 (Minn.1991)). In light of the defendant's lack of evidence of a racially discriminatory purpose on the part of Congress or the Sentencing Commission, we found these statistics unpersuasive. *Id.* at 1559. Likewise here, we conclude that Defendants' statistics are insufficient to establish that 21 U.S.C. § 841(b)(1) and U.S.S.G. § 2D1.1 are unconstitutional under the Equal Protection Clause.

 Legislation that classifies according to race is presumptively invalid and can be upheld only if narrowly tailored to further a compelling governmental interest. *Personnel Adm'r v. Feeney,* 442 U.S. 256, 272, 99 S.Ct. 2282, 2292, 60 L.Ed.2d 870 (1979). This same principle applies to a classification that is neutral on its face but is an obvious pretext for racial discrimination. *Id.; Shaw,* — U.S. —, 113 S.Ct. 2816; *Gomillion,* 364 U.S. 339, 81 S.Ct. 125; *Yick Wo,* 118 U.S. 356, 6 S.Ct. 1064. A neutral law that disproportionately impacts a racial minority does not violate equal protection, however, unless that impact can be traced to a discriminatory purpose. *Feeney,* 442 U.S. at 272, 99 S.Ct. at 2292. Discriminatory purpose implies that the legislature selected a particular course of action, "at least in part, because of, not merely in spite of, its adverse effects upon an identifiable group." *Id.* at 279, 99 S.Ct. at 2296 (internal quotations omitted). Determining whether a legislature was motivated by a discriminatory purpose requires an inquiry into circumstantial and direct evidence of intent. *Arlington Heights v. Metropolitan Hous. Dev. Corp.,* 429 U.S. 252, 266, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977). Discriminatory impact alone will not suffice to show discriminatory purpose unless "a clear pattern, unexplainable on grounds other than race, emerges from the effect of the [legislative] action." *Id.* Examples of such "rare" cases where a statistical pattern is "stark" enough to infer discriminatory purpose are *Yick Wo* and *Gomillion. Id.*

In *Yick Wo,* an ordinance prohibited operation of 310 laundries that were housed in wooden buildings, but allowed such laundries to resume operations if the operator secured a permit from the government. 118 U.S. 356, 6 S.Ct. 1064. When the laundry operators applied for permits, all but one of the white applicants received permits, but none of the over 200 Chinese applicants were successful. *Id.* In *Gomillion,* a state legislature violated the Fifteenth Amendment by altering the boundaries of a city "from a square to an uncouth twenty-eight-sided figure." 364 U.S. at 340, 81 S.Ct. at 126. These alterations excluded 395 of 400 black voters without excluding a single white voter. *Id.* at 341, 81 S.Ct. at 127. In both of these cases, in the absence of evidence to the contrary, the Supreme Court found "the statistical disparities to 'warrant and require,' *Yick Wo,* [118 U.S.] at 373, 6 S.Ct. at 1073, a 'conclusion [that was] irresistible, tantamount for all practical purposes to a mathematical demonstration,' *Gomillion,* [364 U.S.] at 341, 81 S.Ct. at 127, that the State acted with a discriminatory purpose." *McCleskey v. Kemp,* 481 U.S. 279, 292 n. 12, 107 S.Ct. 1756, 1767 n. 12, 95 L.Ed.2d 262 (1987).[5]

We are not persuaded that Defendants' case is analogous to *Yick Wo* and *Gomillion.* Defendants do not claim that African–Americans have been unfairly targeted for prosecution for cocaine base offenses in federal courts. Instead, Defendants rely on statistics which, while incomplete—for example, we have no information on the percent of federal cocaine powder prosecutions brought against African–Americans—clearly demonstrate that the cocaine base enhanced penalty scheme has impacted African–Americans to a greater extent than other groups. However, unlike in *Yick Wo* and *Gomillion,* there is ample evidence of Congress's reasons, other than race, for providing harsher penalties for offenses involving cocaine base. This is not a case where the disproportionate impact of the statute and guidelines on African–Americans is "unexplainable on grounds other than race." Rather, the government offered evidence that Congress provided for enhanced penalties for cocaine base offenses because

5. Similarly, in *Shaw,* the Court, without resolving the issue, held that the appellants at least stated a cognizable claim under the Equal Protection Clause by alleging that a redistricting plan was so bizarre on its face that it is unexplainable on grounds other than race. — U.S. at —, 113 S.Ct. at 2825.

cocaine base (1) has a more rapid onset of action, (2) is more potent, (3) is more highly addictive, (4) is less expensive than cocaine powder, and (5) has widespread availability. *See e.g., Hearing before the Permanent Subcommittee on Investigations of the Committee on Governmental Affairs,* 99th Cong., 2D Sess. 72–91 (1986) (statements of Charles R. Schuster, Ph.D., and Robert Byck, M.D.); *see also* 132 Cong.Rec. S8092 (daily ed. June 20, 1986) (statements of Sen. D'Amato); 132 Cong.Rec. 22,991 (1986) (statements of Rep. Dorgan). Other circuits that have considered the legislative history of the Anti Drug Abuse Act of 1986 have also concluded that Congress provided for harsher penalties for cocaine base offenses for these legitimate reasons. *See e.g., United States v. Lawrence,* 951 F.2d 751, 754–55 (7th Cir.1991); *United States v. Buckner,* 894 F.2d 975, 978–79 (8th Cir.1990); *United States v. Cyrus,* 890 F.2d 1245, 1248 (D.C.Cir.1989). Finally, cocaine base is simply a different drug than cocaine powder, with a different chemical composition, *see Easter,* 981 F.2d at 1558; as a result, Congress can justifiably provide for different penalties for each. Therefore, because reasons exist, other than race, for enhanced penalties for cocaine base offenses, we conclude that Defendants' statistics of disproportionate impact are not sufficient, under the *Yick Wo* and *Gomillion* line of cases, to demonstrate that Congress or the Sentencing Commission had a discriminatory purpose in enacting 21 U.S.C. § 841(b)(1)(B) and U.S.S.G. § 2D1.1, or in leaving them intact.[6]

Because Defendants have failed to demonstrate that either Congress of the Sentencing Commission enacted the enhanced penalty scheme for cocaine base offenses, or left them intact, to further a discriminatory purpose, the scheme is subject only to rational basis review. *Easter,* 981 F.2d at 1559. Under our rational basis analysis of the same

provisions in *Turner,* 928 F.2d at 960, we reject Defendants' claim.

AFFIRMED.

---

6. We also conclude that Sen. D'Amato's isolated reference to an article in Newsweek magazine which used the word "ghetto," when viewed in context, *see* 132 Cong.Rec. S8092 (daily ed. June 20, 1986), is insufficient, when combined with Defendants' statistics, to create any inference

that Congress enacted the enhanced penalty scheme for cocaine base offenses "because of, not merely in spite of," *see Feeney,* 442 U.S. at 279, 99 S.Ct. at 22, the adverse impact it would likely have on African–Americans.