**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**August 22, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

MARCUS TARIN ELLIS,

      Defendant - Appellant.

No. 05-7136
(D.C. No. CR-05-53-01-WH)
(E.D. Okla.)

**ORDER AND JUDGMENT**[*]

Before **KELLY**, **McKAY**, and **LUCERO**, Circuit Judges.

A jury found Marcus Ellis guilty of conspiracy to possess with intent to

distribute methamphetamine, cocaine, and cocaine base in violation of 21 U.S.C.

§ 846 ("Count One"), and of possession with intent to distribute and distribution

of five or more grams of methamphetamine in violation of 21 U.S.C. § 841(a)(1)

& (b)(1)(B) ("Count Two"). He was sentenced to 361 months' imprisonment for

each count, to be served concurrently. On direct appeal before us, Ellis brings

---

[*] The case is unanimously ordered submitted without oral argument
pursuant to Fed. R. App. P. 34(a)(2) and 10th Cir. R. 34.1(G). This order and
judgment is not binding precedent, except under the doctrines of law of the case,
res judicata, and collateral estoppel. The court generally disfavors the citation of
orders and judgments; nevertheless, an order and judgment may be cited under the
terms and conditions of 10th Cir. R. 36.3.

two issues.  First, he appeals his conviction for Count One, arguing that there is insufficient evidence to support the jury's verdict that he conspired to possess with intent to distribute five or more grams of cocaine base.   Second, in regard to Count Two, Ellis argues that expert testimony regarding the total amount of methamphetamine he possessed was presented in violation of the standards and procedures established in Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993), "and should be stricken and not relied upon by the Judge at sentencing." We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and **AFFIRM**.

I

Between April 2004 and March 2005, the government conducted an undercover narcotics sales investigation in Pittsburg County, Oklahoma.  As part of this investigation, a paid confidential informant working for the government made a series of methamphetamine purchases from Ellis.  The investigation led to Ellis's arrest and subsequent trial.  At trial, Kristina Smith testified to purchasing and reselling, on Ellis's behalf, multiple "cookies" of cocaine base, commonly referred to as "crack," as well as methamphetamine.[1]  A jury found Ellis guilty of conspiracy to distribute five or more grams each of methamphetamine and cocaine base and 500 or more grams of cocaine powder in violation of 21 U.S.C. § 846,

---

[1] "Cookies" are round blocks of crack cocaine.  Smith testified that the cookies in this case were approximately six inches in diameter, one inch thick, and weighed about one pound.

and of possession with intent to distribute five or more grams of methamphetamine in violation of 21 U.S.C. § 841(a)(1) & (b)(1)(B).

II

Ellis claims that there was insufficient evidence to support his conviction for conspiracy to distribute cocaine base because the only person testifying to his involvement with cocaine base did not know that crack was cocaine base. We review sufficiency of the evidence claims de novo. United States v. Higgins, 282 F.3d 1261, 1274 (10th Cir. 2002). We must consider the evidence in the light most favorable to the government and determine whether a reasonable jury could have found the defendant guilty of the crime charged beyond a reasonable doubt. United States v. Hamilton, 413 F.3d 1138, 1143 (10th Cir. 2005).

Ellis focuses his argument on an isolated bit of testimony by Smith, the key witness to Ellis's involvement with cocaine base. Because Smith stated that she was unfamiliar with the term "cocaine base," Ellis argues there is insufficient evidence to support his conviction for conspiracy to distribute cocaine base. In addition, Ellis attempts to create an issue over Smith's use of the term "crack" as opposed to "cocaine base." However, our cases have recognized that as a matter of law, "[c]ocaine base . . . as used in the federal statute [§ 841(a)], includes crack." United States v. McIntyre, 997 F.2d 689, 709 n.33 (10th Cir. 1993). See also United States v. Thurmond, 7 F.3d 947, 949 (10th Cir. 1993) ("crack" is a "slang term for cocaine base"); U.S.S.G. § 2D1.1(c) Notes (stating that "cocaine

base" means "crack" and "crack is the street name for a form of cocaine base, usually prepared by processing cocaine hydrochloride and sodium bicarbonate, and usually appearing in a lumpy rocklike form.").

After review of the record, we conclude that Ellis is trying to make a mountain out of a molehill. Although Smith indicated she did not know the difference between crack and cocaine base, she testified extensively to her purchases and sales of both crack and cocaine on Ellis's behalf, including the purchase of more than a pound of crack. She stated that she could distinguish crack from powder cocaine, and that crack was cocaine "rocked up with baking powder." Smith said that she knows what crack is because her ex-boyfriend smoked crack, she had been around it, and had seen it consumed. She also testified that she understood from her attorneys that cocaine base is crack. This is more than sufficient evidence to indicate that Smith could identify crack as such. The testimony of another witness, Billy Talley, supports Smith's account. Talley testified that he had witnessed Smith purchase crack on Ellis's behalf and was familiar with crack. Accordingly, there was more than sufficient evidence to support Ellis's conviction for conspiracy to distribute cocaine base as well as the jury's special verdict that Ellis conspired to possess with intent to distribute five grams or more of cocaine base.

III

Ellis challenges the introduction of testimony at sentencing as to the quantity of methamphetamine found in the drugs seized from him upon his arrest. He claims that the court failed to conduct its gatekeeping role under <u>Daubert</u> by ensuring that the testimony introduced was sufficiently reliable to be presented to a jury. Specifically, he asserts that the testimony about the total amount of methamphetamine found did not satisfy the requirements of <u>Daubert</u> because the grinding and sampling procedures used did not meet scientific standards. We agree with Ellis that the court failed to perform its gatekeeping role. Because that error was harmless, however, we affirm.

At trial, the identification and quantification of the drugs seized from Ellis upon his arrest was a significant issue. John Giles and Marty Wilson, analysts for the Oklahoma Bureau of Investigation, testified to the methods used to identify and determine the quantity of methamphetamine. Both agents testified to the lab protocols each used to identify these substances. Giles testified to using gas chromatography mass spectroscopy ("GCMS") to measure the actual methamphetamine found in one sample, while Wilson testified to using high performance liquid chromatography ("HPLC") to determine the quantity of actual methamphetamine found in the alleged drug material seized from Ellis. Because these tests destroy the samples used, only a small portion of the drugs seized is tested.

One concern with any sampling test is ensuring that the sample is representative of the whole. If a sample tested has a higher or lower concentration of the target drug, the test results provide inaccurate information about the total amount of that drug and may mislead the court if used during sentencing. Giles and Wilson both testified that, to ensure the uniformity of the samples tested, they ground up the partially crystalline powders seized from Ellis prior to performing their tests. Both technicians testified that the Oklahoma State Bureau of Investigation does not have a protocol for conducting such homogenization procedures. They also testified that methamphetamine is typically not uniform in its mixture, and at times can "glob[] together." Clumping is particularly problematic when the sample is moist. Wilson testified that when he conducts the test on a small sample, he grinds the entire sample and takes a small section from that sample. For larger samples, he grinds only a portion of the sample. Giles testified to two different techniques for preparing samples. His practice is to grind the entire sample before removing a portion for testing. In contrast, Giles stated that the method used by one of his employees, Brad Knight, is to remove a portion of the sample and grind only that portion prior to testing. Knight's procedure generated a result that varied from Giles's result by more than ten percent. Both Giles and Wilson testified that they did not know of any tests or scientific papers demonstrating the uniformity of methamphetamine after grinding. Wilson testified that his method was "based on the general principles

used in science. If you are going to sample something and try to determine the identity or how much is in there, good science is to get a representative sample of it."

Ellis moved to exclude Wilson's testimony on the grounds that it did not comply with Daubert. Ellis claims that Wilson presented no evidence demonstrating the reliability of the techniques used to extrapolate the quantity findings from the small portions tested to the entire drug sample. The district court denied the motion, finding that "the tests that were done are sufficiently reliable under . . . 702, [and] 703, . . . and under the Daubert case I think that any . . . potential or perceived problems with that can be something for the jury to sort out and is a proper subject of argument, but I don't think it rises to the level that I need to exclude it under Daubert." Ellis renewed his motion after Giles's testimony and at the close of trial. The court again denied the motion, stating that "it doesn't take a scientist to know that when you make a pitcher of Kool-Aid you don't just pour the package in on top of the water. I mean, you stir it up so there's not hot spots of cherry."

Under Fed. R. Evid. 702, the Supreme Court has required district courts to perform a gatekeeping role to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Daubert, 509 U.S. at 589. The reliability of expert testimony turns on its status as scientific knowledge. Id. at 590. The district court may determine that expert testimony is reliable by

inquiring into the qualifications and background of the expert and asking if "the reasoning or methodology underlying the testimony is scientifically valid." Bitler v. A.O. Smith Corp., 400 F.3d 1227, 1233 (10th Cir. 2004) (quoting Daubert, 509 U.S. at 592-93). The scientific validity of a test may be established by considering, among other factors: "(1) whether a theory has been or can be tested, (2) whether the theory or technique has been subject to peer review and publication, (3) whether there are known or potential rates of error with regard to specific techniques, and (4) whether the theory or approach has 'general acceptance.'" Daubert, 509 U.S. at 593-94.

We review de novo whether the district court has performed its critical gatekeeping role. Bitler, 400 F.3d at 1232. If the court has performed this role, we review for abuse of discretion the manner in which a district court makes the decision to admit or exclude expert testimony. Id. A district court has latitude in determining the procedures used to perform its gatekeeping function. United States v. Charley, 189 F.3d 1251, 1266 (10th Cir. 1999). For instance, it may do so without holding a Daubert hearing. See United States v. Call, 129 F.3d 1402, 1405 (10th Cir. 1997). As long as a district court has sufficient evidence to assess that the expert testimony "rests on a reliable foundation and is relevant to the task at hand" it may satisfy the gatekeeping function by ruling on an objection at trial. Goebel v. Denver & Rio Grande Western R.R. Co., 215 F.3d 1083, 1087 (10th Cir. 2000). The court must, however, "adequately demonstrate by specific

findings on the record that it has performed its duty as gatekeeper." Dodge v. Cotter Corp., 328 F.3d 1212, 1223 (10th Cir. 2003). "Without specific findings or discussion on the record, it is impossible on appeal to determine whether the district court carefully and meticulously reviewed the proffered scientific evidence or simply made an off-the-cuff decision to admit the expert testimony." Id. (quotations omitted). "In the absence of such findings, we must conclude that the court abused its discretion in admitting such testimony." Id.

A district court must conduct a two-part inquiry to fulfill its gatekeeping role. First, the court asks whether the proffered testimony has "a reliable basis in the knowledge and experience" of the relevant discipline. Bitler, 400 F.3d at 1232-33. To make such a determination, a court should inquire into the qualifications and background of the expert and ask if "the reasoning or methodology underlying the testimony is scientifically valid." Id. (quoting Daubert, 509 U.S. at 592-93). "[A]ny step that renders the analysis unreliable . . . renders the expert's testimony inadmissible." Mitchell v. Genecorp., Inc., 165 F.3d 778, 782 (10th Cir. 1999). Second, the court must determine if the testimony is "relevant to the task at hand." Bitler, 400 F.3d at 1234 (quoting Daubert, 509 U.S. at 597).

The district court made no specific findings that the testimony by Giles and Wilson was based on a reliable foundation.[2] The court did not address whether the grinding and sampling techniques used were generally accepted by the forensic community. Ellis's attorney established that the technique had not been tested for uniformity, that there had not been peer review or publication on this matter, and that there was at least a possibility of error, given the differing results on the tests conducted by Knight and those conducted by Giles. Accordingly, the court failed to perform the first task of the gatekeeping role – determining whether the proffered testimony was reliable and had a scientific basis.

In performing the gatekeeper function, the district court's role is not to determine whether a matter testified to by an expert could be interpreted by a jury, but rather to assess the reliability of the principles and methods underlying the expert's opinion to determine if it should be presented to a jury in the first instance. Bitler, 430 F.3d at 1232-33. In other words, the district court's effort to draw an analogy of the dry grinding process used to homogenize a sample to making Kool-Aid is not apt.

The government suggests that the matter at issue before us – whether the sub-sample tested is representative of the entire portion of drugs seized – is not

_____

[2] Although the relevance of the expert testimony was not at issue – the amount of methamphetamine seized from Ellis is clearly relevant to the charge of possession with intent to distribute more than five grams of methamphetamine – the court was obligated, under Goebel, to make a specific finding as to relevance. See Goebel, 215 F.3d at 1087.

subject to the rules of Daubert because the district court took notice of "a

centuries old principle of uniformity, i.e. when a substance is mixed, it becomes

more uniform."[3]

Daubert did suggest that a court could take judicial notice of "theories that

are so firmly established as to have attained the status of scientific law." Daubert,

509 U.S. at 592 n.11 (giving as an example the laws of thermodynamics); see also

Fed. R. Evid. 201(b) (permitting courts to take judicial notice of facts by resort to

sources "whose accuracy cannot reasonably be questioned").  However, multiple

discrete probes of a dry substance in order to obtain a representative sample is not

so well known.  Neither the government nor the court pointed to any source

"whose accuracy cannot reasonably be questioned" demonstrating that

methamphetamine becomes so uniformly distributed when ground up that

different samples from the same population will provide sufficiently similar

results.  If anything, Ellis's attorney's questions, and Giles's and Wilson's

answers, quite reasonably call into doubt the uniformity of the samples,

demonstrating a variation of ten percent between one sample and the next, and the

lack of a protocol for preparing and selecting samples from seized drugs.

---

[3] The government also argues that Daubert does not apply to the agents'
sampling method because Ellis's attack goes only to the method of acquisition of
the evidence, not the analysis of the evidence.  We disagree.  As we stated in
United States v. Lauder, 409 F.3d 1254, 1264 (10th Cir. 2005), a methodology
used to analyze evidence – whether to determine quantity or quality – clearly falls
within the Daubert framework.

Daubert's gatekeeping requirement thus applies to Giles's and Wilson's testimony about the quantity of methamphetamine, and the government must establish, at a minimum, that the sampling technique used is reasonably reliable. See United States v. Dent, 149 F.3d 180, 190-91 (3d Cir. 1998) (holding that statistical evidence supporting sampling technique is not required; instead, the government may establish reliability of drug quantity measurements based on extrapolation from a test sample by demonstrating an adequate basis in fact for extrapolation and that the quantity was determined with an accepted standard of reliability); see also United States v. Scalia, 993 F.2d 984, 989 (1st Cir. 1993) (holding that statistical evidence supporting the sampling techniques is not necessary; instead, reasonable reliance may be found where a preponderance of evidence establishes that (1) a proper "random" selection procedure was employed, (2) the chemical testing method conformed with accepted methodology, (3) the tested and untested samples were sufficiently similar in physical appearance, and (4) the tested and untested samples were contemporaneously seized at the search scene).

We now turn to Ellis's specific challenge to the court's reliance on Giles's and Wilson's testimony. It is not clear whether he challenges the underlying conviction for possession with intent to distribute more than five grams of methamphetamine or the determination of drug quantity for purposes of sentencing. Assuming that he did challenge the underlying conviction, on review of the record we conclude that although the district court failed to perform its

gatekeeping role under Daubert, any consideration of Giles's and Wilson's testimony was harmless error. A government agent testified that an informant made multiple purchases of more than 3.6 grams of methamphetamine, the agent himself made one purchase of more than 3.6 grams of methamphetamine from Ellis, and Smith testified to buying from and selling on behalf of Ellis more than five grams of methamphetamine. Thus, as to Ellis's conviction, any error from the introduction of Giles's and Wilson's testimony is harmless. See Goebel, 215 F.3d at 1089 ("Erroneous admission of evidence is harmless only if other competent evidence is 'sufficiently strong to permit the conclusion that the improper evidence had no effect on the decision.'").

As to the use of Giles's and Wilson's testimony at sentencing, we also conclude that it was harmless error. Unquestionably, the district court relied on the evidence presented at trial in deciding to accept the sentencing recommendations in the pre-sentence report ("PSR"). The PSR indicated that Ellis possessed with intent to distribute 71.1 grams of a mixture of methamphetamine (142.2 kilograms of marijuana equivalent),[4] or approximately 24.9 grams of actual methamphetamine (497.5 kilograms of marijuana equivalent). In reviewing the total amount of drugs identified in the PSR, we conclude this was equivalent to 20,420.85 kilograms of marijuana. Had Giles's

_____

[4] Ellis does not raise any issue as to the validity of the testing by Giles or Wilson to determine that Ellis possessed with intent to distribute the 71.1 grams of a mixture of methamphetamine.

and Wilson's testimony been excluded, the court would have had to consider only the amount of mixed, rather than actual, methamphetamine when determining Ellis's sentence. Under this calculus, Ellis's marijuana equivalent would be reduced by 355 kilograms, for a marijuana equivalent total of 20,065.85 kilograms. Either amount places Ellis at a base offense level of thirty-six.[5] As a result, the exclusion of Giles's and Wilson's testimony would not have affected Ellis's base offense level and we **AFFIRM** his sentence.

IV

Because we conclude that there is sufficient evidence to support Ellis's conviction for conspiracy to possess with intent to distribute cocaine, cocaine base, and methamphetamine, we **AFFIRM** his conviction on Count One. Additionally, we conclude that the district court's failure to perform his Daubert gatekeeping function was harmless, and therefore **AFFIRM** his conviction and sentence for possession with intent to distribute more than five grams of methamphetamine (Count Two).

ENTERED FOR THE COURT

Carlos F. Lucero
Circuit Judge

---

[5] Under U.S.S.G. § 2D1.1, violations of §§ 846 and 841(a)(1) involving between 10,000 and 30,000 kilograms of marijuana equivalent are sentenced at a base offense level of 36.