UNITED STATES COURT OF APPEALS
**Filed 8/8/96**
TENTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

KENNETH RAY WRIGHT,

Defendant-Appellant.

No.95-3162
(D.C. Kansas)
(D.C. No. 93-10083-03)

## ORDER AND JUDGMENT[*]

Before **PORFILIO**, **HOLLOWAY**, and **MURPHY**, Circuit Judges.


Kenneth Ray Wright appeals his convictions, after a jury trial, of

conspiracy to distribute and distribution of cocaine base ("crack") in violation of

21 U.S.C. §§ 841(a)(1) and 846. On appeal, Wright contends as follows: (1) the

evidence was insufficient to support the jury's guilty verdicts as to both the

conspiracy and distribution counts; (2) the district court abused its discretion in

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

allowing the government to introduce evidence of Wright's alleged prior bad acts; and (3) the disparate treatment of powder and crack cocaine for sentencing purposes violates the Equal Protection and Due Process Clauses. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

## BACKGROUND

The facts, stated briefly and taken in a light most favorable to the government, are as follows. In September of 1993, members of the Drug Enforcement Agency Task Force (the "Task Force") in Wichita, Kansas, began an investigation of Joyce Davis. Confidential informants had indicated to Officer Daniel Walton that Davis was selling drugs out of her apartment. The Task Force originated a plan whereby the two confidential informants, known as "Steve" and "Janet," would make controlled purchases of drugs at Davis's apartment. Members of the Task Force filmed the area around Davis's apartment during the transactions and listened to the transactions via transmitters worn by Steve and Janet.

The first two controlled buys took place on September 8, 1993. Janet called Davis from the police station and asked if Davis could get her a quarter ounce of crack. Steve and Janet then went to the apartment to purchase the crack. The first purchase was made from two individuals identified as Jamal and Jay.

When Jamal and Jay arrived at the apartment, Davis asked Steve and Janet to go to the bedroom. Shortly thereafter, Davis told them they could come out and indicated that Jamal and Jay were relatives who stopped to visit. Steve eventually purchased $100 worth of crack from Jamal and Jay.

The second purchase on September 8th took place soon after the departure of Jamal and Jay. The Task Force members who were listening could hear a knock on Davis's door. Davis then asked Steve and Janet to go to the bedroom. Soon thereafter, Davis brought a package containing crack to the bedroom and was given $350 by Steve. Davis then left the bedroom. After a short while, Davis escorted them out of the bedroom and indicated that "Carl" had left. Although Carl was not observed by the members of the Task Force, he was later identified as Carlton J. Watkins.

Several additional purchases, each following a similar pattern, took place during September of 1993. Either Janet or Steve would place a call to Davis; both would then proceed to her apartment. Soon Watkins would appear and Davis would have Steve and Janet go into the bedroom. Davis would then bring the crack to them and Steve would give Davis the money for the purchase. After Davis would leave the bedroom, Watkins would leave the apartment.

On October 5, 1993, arrangements were made for Steve and Janet to again purchase crack from Davis. This time, however, the officers planned to arrest

Watkins when he arrived. When Watkins arrived, he became suspicious and drove away. Task Force officers pursued and arrested Watkins.

When Watkins did not show up at Davis's apartment, Davis indicated that she might be able to obtain crack from someone named "Ken." Janet was able to observe Davis dial the phone to activate a pager. When Ken failed to return the page, Steve and Janet left Davis's apartment. Steve and Janet informed Davis that they were going to talk to another source of crack. After leaving the apartment Janet wrote down the number that Davis had dialed and gave it to the Task Force. A member of the Task Force recognized it as belonging to Kenneth Ray Wright. Members of the DEA surveillance team observed and identified Wright as he entered Davis's apartment after Steve and Janet left.

Sometime later that day, either Steve or Janet telephoned Davis and advised her, "that the stuff that they had gone to look at wasn't any good, and if she had a supplier, they were still interested in trying to make a purchase, could they hook up." Davis said that "Kenny" had been there right after they left and she would be able to make the three-ounce deal they wanted. Davis advised that they were to call back later that afternoon to set up a meeting.

After making a second call to confirm the deal, Janet and Steve returned to Davis's apartment. Task Force members observed Wright as he arrived at Davis's apartment. Wright met with Davis's boyfriend, Andre Bencent, outside of the

-4-

apartment. After a brief discussion with Wright, Bencent went into the apartment. Minutes later, Wright got out of his car and began walking toward the apartment. Bencent exited the apartment and met Wright on the stairs outside the apartment. After speaking briefly with Bencent, Wright left the area.

Immediately after Davis delivered to Steve and Janet the crack that Wright had provided, Steve indicated that he had left part of the money for the purchase at his motel because he was nervous about dealing with a new source of supply. Steve left the apartment, telling Davis he would return with the remainder of the money shortly. Steve then met with a member of the Task Force and turned over the one-half ounce of crack he had just purchased from Wright, Davis, and Bencent. After meeting with the officers, Steve returned to Davis's apartment with the remainder of the money.

Shortly after Steve returned to Davis's apartment, Wright again appeared at the apartment and again met with Bencent. Members of the Task Force observed Bencent going up to the apartment, then going to Wright's car and back to the apartment. When Bencent got out of Wright's car, Wright left the area. Steve and Janet then left the apartment. They then met with members of the Task Force and turned over a brown paper sack which contained three knotted baggies. Steve and Janet had been told that the baggies contained powder cocaine. A field test indicated the substance was not cocaine.

Wright was arrested later that same day. During a search incident to his arrest, officers discovered that Wright was carrying $1,200 in one pocket and $600 in another. The money found on Wright was the same money given to Steve and Janet earlier that day to make the cocaine purchases. When questioned about the money, Wright explained that $600 of the money belonged to a girlfriend and $1200 had come from the sale of a car.

When officers explained that they knew the source of the bills, that he had been videotaped at the Davis apartment, and that his arrest was for the cocaine and baking soda he had sold, Wright admitted that he had delivered the half ounce of crack cocaine to the apartment. He asserted, however, that he had merely delivered the drugs for someone else. Wright further asserted that after the delivery, he had realized there was money to be made. Thus, according to Wright, he created the baking soda packets to get the rest of the money.

A pager was also taken from Wright at the time of his arrest. Officers discovered that the pager's memory listed two calls from the telephone in Davis's apartment. The pages contained Davis's telephone number and the following numerical sequences, 28-911-9 and 099-911-911. At trial, the Task Force member who found the pager opined that these numerical sequences communicate Davis's desire to quickly purchase an ounce of crack.

Wright was eventually indicted on distribution and conspiracy charges. At trial, members of the Task Force testified to the basic facts set out above. Davis testified that on October 5th she contacted Watkins for the purpose of supplying cocaine to Steve and Janet. When Watkins failed to show up, she contacted Wright for a delivery. When Wright first came to her apartment on October 5th, he did not have any crack. Davis contacted Wright a second time that day and Wright indicated he could get some crack. Wright then came to the apartment complex with approximately one-half ounce of crack, which was to serve as a sample. If Janet and Steve liked the quality of the initial delivery, Wright was to deliver an additional two and one-half ounces. Wright informed Davis that he was nervous about entering her apartment. Accordingly, Bencent acted as a drug and money courier, traveling back and forth between Davis's apartment and Wright's car.

At the conclusion of the trial, the jury convicted Wright of distribution and conspiracy to distribute crack cocaine.

## ANALYSIS

Wright asserts that the evidence presented at trial was insufficient to support his distribution and conspiracy convictions. When faced with a sufficiency of the evidence challenge, we review the record *de novo*. *United*

*States v. Chavez-Palacios*, 30 F.3d 1290, 1293-94 (10th Cir. 1994). "Evidence is sufficient to support a criminal conviction if a reasonable jury could find the defendant guilty beyond a reasonable doubt, given the direct and circumstantial evidence, along with reasonable inferences therefrom, taken in a light most favorable to the government." *United States v. Mains*, 33 F.3d 1222, 1227 (10th Cir. 1994). This court has repeatedly noted the limited and deferential nature of appellate review of claims challenging the sufficiency of the evidence. Applying this deferential standard, we will overturn a jury's conclusion of fact only if we find that no reasonable juror could have reached the disputed verdict. *Chavez-Palacios*, 30 F.3d at 1294; *United States v. Hoenscheidt*, 7 F.3d 1528, 1530 (10th Cir. 1993).

We first address Wright's challenge to his conviction for possession with intent to distribute. In order to sustain a conviction for possession with intent to distribute under 21 U.S.C. § 841(a)(1), the government must prove that the defendant: (1) possessed a controlled substance; (2) knew he possessed a controlled substance; and (3) intended to distribute the controlled substance. *Mains*, 33 F.3d at 1228. Upon review of the record, we find an abundance of evidence from which a reasonable jury could have found Wright guilty beyond a reasonable doubt of possession with intent to distribute.

In challenging his conviction on the distribution claim, Wright contends that there was no proof of communication with Davis indicating a buyer-seller relationship. This contention is without merit. Davis testified that she paged Wright to inquire about a crack delivery for Janet and Steve. Wright arrived at Davis's apartment and informed her that he did not have any crack. Davis paged Wright a second time that day and again asked if he could supply crack cocaine. According to Davis's testimony, Wright responded to her call and informed her that he could get the crack. Wright then drove to Davis's apartment and delivered a one-half ounce sample of crack to Davis's boyfriend, Andre Bencent. Because Wright did not want to go up to Davis's apartment, Bencent acted as a go-between, shuttling between the apartment and Wright's car. In light of Davis's testimony, Wright's claim that there was no evidence of communication between he and Davis is simply wrong. In fact, the record demonstrates active negotiations between Davis and Wright over the course of much of the day. The evidence adduced at trial was sufficient to support Wright's conviction of possession of cocaine with intent to distribute.

Having addressed his conviction for possession with intent to distribute, we move on to address Wright's conspiracy conviction. To prove a conspiracy, the government must show the following: (1) two or more persons agreed to violate the law; (2) the defendant knew at least the essential objectives of the conspiracy;

(3) the defendant knowingly and voluntarily became a part of it; and (4) the alleged coconspirators were interdependent. *United States v. Owens*, 70 F.3d 1118, 1126 (10th Cir. 1995). Viewed in the light most favorable to the government, there was sufficient evidence from which a reasonable jury could conclude that Wright conspired with Davis and Bencent to distribute cocaine.

Wright argues that he was merely trying to defraud his purported coconspirators by selling them baking soda rather than cocaine. According to Wright, he was thus acting contrary to the interests of the conspiracy and did not have the common purpose or design necessary to show participation in the conspiracy. *See United States v. Slater*, 971 F.2d 626, 630 (10th Cir. 1992). We find Wright's argument unconvincing. During cross-examination of Davis and Agent Michael Crawford, Wright's attorney developed at trial this same theory of the case. The jury rejected Wright's theory. In light of the evidence presented by the government, we cannot say that a reasonable juror was obligated to accept Wright's theory of the case or that his theory must necessarily create reasonable doubt.[1]

---

We note that the jury could have reasonably concluded Wright never intended to defraud his coconspirators and delivered the baking soda simply because he was unable to obtain enough cocaine to complete the transaction. Similarly, the jury could have reasonably concluded that Wright formulated the intent to defraud only *after* he had become a member of the conspiracy and completed the first transaction.

The government produced evidence demonstrating that Wright, Davis, and Bencent, agreed to provide cocaine to Steve and Janet under circumstances where none of them were able and willing to do so alone. The evidence demonstrated that Davis and Wright engaged in extensive negotiations throughout the day before agreeing on a plan to distribute cocaine to Steve and Janet. Wright agreed to provide three ounces of cocaine to Steve and Janet *through and with the cooperation of Davis and Bencent.* Wright needed Davis and Bencent to complete the transaction and act as go-betweens because he was unwilling to meet face to face with Steve and Janet. Wright arrived at the apartment and delivered a half ounce of crack to Bencent, who then ferried the drugs and money back and forth between the apartment and the car. The same arrangement was used when Wright arrived later in the day to complete the transaction. Under these facts, the government proved all that was required: (1) two or more persons, Wright, Davis, and Bencent, agreed to violate the law; (2) Wright knew the essential objective of the conspiracy was to deliver drugs to Steve and Janet; (3) Wright became part of the conspiracy knowingly and of his own free will; and (4) Wright, Davis and Bencent were interdependent. The evidence was thus sufficient to support the conspiracy conviction.

Wright next claims that the district court erred in admitting evidence of Wright's alleged prior narcotics transactions. At trial, Wright's counsel made a

strategic decision to cross-examine Agent Crawford about a conversation that took place between Wright and Crawford after Wright's arrest. On redirect, the government sought to examine Crawford about additional aspects of the conversation, specifically about whether Wright had admitted to involvement in other drug transactions. When Wright objected, the government asserted that Wright had "opened the door" to this area of questioning. According to the government, Wright's questions of Crawford left the impression that the incident in question was nothing more than a solitary transaction where Wright acted as no more than an unpaid drug courier. The district court agreed that Wright had opened the door by leaving the jury with a false impression about the conversation between Wright and Crawford and that the government was entitled to correct that false impression.

This court reviews the district court's decision to admit or exclude evidence for an abuse of discretion. *United States v. Conway*, 73 F.3d 975, 980-81 (10th Cir. 1995). Under this standard, we will reverse the trial court only when its decision is "'arbitrary, capricious, whimsical, or manifestly unreasonable.'" *United States v. Hernandez-Herrera*, 952 F.2d 342, 343 (10th Cir. 1991) (quoting *United States v. Cardenas*, 864 F.2d 1528, 1530 (10th Cir.), *cert. denied*, 491 U.S. 909 (1989)); *see also FDIC v. Oldenburg*, 34 F.3d 1529, 1555 (10th Cir. 1994). We have carefully reviewed the trial transcript and conclude that the

district court did not abuse its discretion in allowing the government to more fully develop the nature of the conversation between Wright and Crawford, including the fact that Wright had admitted to being involved in other drug transactions. *See United States v. Catano*, 65 F.3d 219, 226 (1st Cir. 1995) ("A district court may allow testimony on redirect which clarifies an issue which the defense opened up on cross-examination even when this evidence is otherwise inadmissible."). Certainly, the district judge is the person in the best position to assess the import of Wright's cross-examination of Crawford and the possibility that the cross-examination might have misled the jury. *See Oldenburg*, 34 F.3d at 1555-56 (noting district court's superior position for viewing the evidence and assessing its probative value). Accordingly, we are unwilling to conclude that the district court's decision to allow the government to further explore the conversation between Wright and Crawford was manifestly unreasonable. *See Hernandez-Herrera*, 952 F.2d at 343.

Finally, Wright asserts that section 2D1.1 of the Sentencing Guidelines, which equates one gram of crack cocaine to one hundred grams of powder cocaine, violates the constitutional guarantee of equal protection because it imposes harsher sentences on African-Americans than on Caucasians.

This court recently rejected an identical equal protection challenge to section 2D1.1. *United States v. Williamson*, 53 F.3d 1500, 1530 (10th Cir.), *cert.*

-13-

*denied*, 116 S. Ct. 218 (1995). The *Williamson* court noted this Circuit has consistently rejected the argument that disparate treatment of crack and powder cocaine necessarily implies a finding of intentional discrimination. *Id.* (collecting cases).[2] Similarly, this Circuit has consistently rejected the claim that the distinction between crack and powder cocaine is not a rational distinction. *Id.* (collecting cases). Accordingly, under the authority of *Williamson*, we conclude that the distinction between crack and powder cocaine set out in section 2D1.1 does not violate the Equal Protection Clause.

    **AFFIRMED**.

                        ENTERED FOR THE COURT

                        Michael R. Murphy
                        Circuit Judge

---

    Wright seems to contend that a special report of the Sentencing Commission to Congress regarding Cocaine and Federal Sentencing Policy somehow supports his claim that Congress adopted the distinction between crack and powder cocaine to specifically disadvantage African-Americans. We can find nothing in the special report to support this contention. *See United States v. Moore*, 54 F.3d 92, 99 (2d Cir. 1995) (noting that special report does not support claim of intentional discrimination), *cert. denied*, 116 S. Ct. 793 (1996).