**UNITED STATES of America, Appellee,**

v.

**Manuel THEN, Defendant–Appellant.**

**No. 1359, Docket 94–1485.**

United States Court of Appeals,
Second Circuit.

Submitted April 17, 1995.

Decided June 5, 1995.

**465**

Terence L. Kindlon, Kindlon and Shanks, P.C., Albany, NY, for defendant-appellant.

Paul D. Silver, Asst. U.S. Atty., N.D.N.Y., Albany, NY (Thomas J. Maroney, U.S. Atty., on the brief), for appellee.

Before: MESKILL, ALTIMARI and CALABRESI, Circuit Judges.

ALTIMARI, Circuit Judge:

Defendant-appellant Manuel Then ("Then") appeals from a judgment entered in the United States District Court for the Northern District of New York (McAvoy, J.), convicting him, following a plea of guilty, of assorted narcotics offenses, and sentencing him principally to 210 months' imprisonment. Then argues that (1) the district court engaged in impermissible double-counting in denying him credit for acceptance of responsibility and enhancing his sentence for obstructing justice, and (2) the treatment by the Sentencing Guidelines of crack cocaine relative to powder cocaine violates the Equal Protection Clause of the United States Con-

stitution. Because we conclude that both arguments lack merit, we affirm the judgment of the district court.

## BACKGROUND

Then was charged in a four-count indictment on January 7, 1994 with: conspiring to distribute and to possess with the intent to distribute cocaine and cocaine base, in violation of 21 U.S.C. § 846; distributing cocaine base, in violation of 21 U.S.C. § 841; possessing cocaine with intent to distribute, in violation of 21 U.S.C. § 841; and attempting to possess cocaine base with intent to distribute, in violation of 21 U.S.C. § 841. Codefendant Louis Felix ("Felix") was charged in three counts of the indictment, but was not charged with distributing cocaine base.

Then pleaded guilty to all four counts of the indictment without entering into a plea agreement on March 16, 1994, one day following jury selection. During the plea allocution, defense counsel explicitly stated that Then was pleading guilty only to his own acts, but was not admitting that he acted in conjunction with Felix. Then agreed with the government's characterization of the acts underlying his guilty plea: that an individual named Patrice McGill identified Then, who went by the name "Odli," as his source of cocaine; that McGill explained that Then was supposed to bring eight ounces of powder cocaine to Albany and retrieve eight ounces of cocaine base on the following day; and that when Then was arrested "he had on his person approximately eight ounces of powder cocaine and he stated to [the] Special Agent ... that he was there to retrieve the cocaine base that was seized the day before."

Two days later, Then testified on behalf of Felix at the latter's trial. A jury acquitted Felix on all three counts charged. On cross examination during Felix's trial, Then stated that he did not "come [to Albany] to retrieve eight ounces of cocaine base. [He] came to deliver the package ... to McGill." At Then's sentencing, the government asked the district court to deny credit for acceptance of responsibility and to enhance Then's sentence for obstruction of justice, based primarily on the disparity between Then's re-

sponses at his plea allocution and his testimony at Felix's trial. The district court agreed, but expressed concern that relying on the same conduct—his trial testimony—as a basis for both a denial of credit and an enhancement might constitute impermissible double-counting. Ultimately, the district court decided it did not, and, given Then's total offense level of 36 and criminal history category 2, sentenced Then principally to 210 months' imprisonment.

Then now appeals.

## DISCUSSION

### 1. Double Counting

■ Then's first argument on appeal is that the district court impermissibly double-counted in denying him credit for acceptance of responsibility and enhancing his sentence for obstruction of justice based on the same conduct. A district court does not engage in impermissible double-counting when it considers a single act that "is relevant to two dimensions of the Guidelines analysis." *United States v. Campbell*, 967 F.2d 20, 25 (2d Cir.1992). Because the disparity between Then's remarks at his plea allocution and at Felix's trial evidences both a failure to accept responsibility and an attempt to obstruct justice, we reject his argument. *See United States v. Echevarria*, 33 F.3d 175, 179 (2d Cir.1994) ("We reject Echevarria's contention that the district court's reliance on the same statement both to increase his sentence under § 3C1.1 and to deny a reduction under § 3E1.1 constitutes double-counting.").

### 2. Sentencing Guidelines and Equal Protection

■ Then next claims that the treatment by the Sentencing Guidelines of crack cocaine (cocaine base) as the equivalent of 100 times as much powder cocaine, *see* U.S.S.G. § 2D1.1(c), Drug Quantity Table, violates the Equal Protection Clause of the United States Constitution. He claims that there is no

credible scientific evidence supporting the view that crack cocaine is more addictive or dangerous than powder cocaine, rendering the sentencing disparity irrational. Moreover, he argues that the 100:1 ratio impacts unfairly upon racial minorities, who statistically speaking are the primary consumers of crack cocaine, as opposed to powder cocaine, which is consumed primarily by non-minorities. *See generally State v. Russell*, 477 N.W.2d 886 (Minn.1991) (*en banc*). We have, however, recently rejected this argument. *See United States v. Stevens*, 19 F.3d 93, 97 (2d Cir.1994) ("we join six other circuits that have similarly held that the Guidelines' 100 to 1 ratio of powder cocaine to crack cocaine has a rational basis and does not violate equal protection principles"). Even more recently, this Court has held that Congress did not act with discriminatory intent in adopting the sentencing ratio at issue. *See United States v. Moore*, 54 F.3d 92 (2d Cir.1995). We therefore reject Then's contention.

In addition, we decline to accept the invitation by the concurrence to notify Congress that if it does not adopt the recommendation of the Sentencing Commission, this Court in the future might invalidate the sentencing ratio as unconstitutional. Just as we ordinarily do not issue advisory opinions, we should not suggest to Congress that it ought to adopt proposed legislation. Our role is limited to interpreting and applying the laws that Congress passes, and striking down those that we conclude are unconstitutional.

## CONCLUSION

Accordingly, the judgment of the district court is affirmed.

CALABRESI, Circuit Judge, concurring:

I join the opinion for the Court in full except for the penultimate paragraph. Nevertheless, I deem it appropriate to add a few words about Then's equal protection claim.[1]

1. The majority suggests that this concurrence constitutes an advisory opinion as well as a call to Congress to act. With great respect, I disagree. Advisory opinions decide situations which have not yet occurred. This opinion has no such intention. It is, rather, in the nature of

a common sort of concurrence; that is, one that indicates what the majority opinion has not decided because it is not yet before the Court. Nor do I mean to invite any particular action from the Congress. On the other hand, I cannot agree that our role is simply "limited to interpreting

The unfavorable and disproportionate impact that the 100-to-1 crack/cocaine sentencing ratio has on members of minority groups is deeply troubling. At present, however, it does not warrant a finding of purposeful racial discrimination and hence it does not, given the rule set down in *Washington v. Davis* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), require us to apply "the strictest scrutiny [to this] adverse differential treatment." *Rogers v. Lodge,* 458 U.S. 613, 617 n. 5, 102 S.Ct. 3272, 3275 n. 5, 73 L.Ed.2d 1012 (1982). As this Court held in *United States v. Moore,* 54 F.3d 92 (2d Cir.1995), at the time the sentencing ratio was adopted, the link between foreseeable discriminatory impact and motive was insufficient to establish the kind of discriminatory intent on the part of Congress or the Commission that is needed to support this sort of equal protection claim. *See id.* at 96-99.

Similarly, this Court's decision in *United States v. Stevens,* 19 F.3d 93 (2d Cir.1994), was in my view correct when it held that, based on the evidence available at the time, Congress and the Sentencing Commission did not act irrationally in making the distribution of a given quantity of crack an enormously more serious crime than the distribution of the same quantity of cocaine. *See id.* at 96-97 (finding that "the greater accessibility and addictiveness of crack" provides a rational basis for harsher penalties).

But what is known today about the effects of crack and cocaine, and about the impact that the crack/cocaine sentencing rules have on minority groups, is significantly different from what was known when the 100-to-1 ratio was adopted. As a result, constitutional arguments that were unavailing in the past may not be foreclosed in the future.

The Sentencing Commission—after an extended investigation that culminated in a comprehensive report to Congress, *see* United States Sentencing Commission, *Special Report to Congress: Cocaine and Federal Sentencing Policy* (Feb.1995) [hereafter *Cocaine Report* ]—has found that there is scant evidence to support the notion that crack poses a substantially greater threat to drug users or to society generally than does powder cocaine. The Commission has also determined that, whatever greater danger crack might pose, the harm clearly does not justify the current 100-to-1 sentencing ratio. *See id.* at 195–198. *Cf. State v. Russell,* 477 N.W.2d 886, 889–90 (Minn.1991) (concluding that evidence of crack's greater harm was insufficient to provide a rational basis for the 10–to–3 sentencing ratio in Minnesota's law).

Furthermore, as this Court has recently pointed out, the statistical evidence demonstrating the discriminatory impact of the current sentencing differential is now "irresistible." *Moore,* 54 F.3d at 97. Over 95% of offenders convicted in federal court for crack distribution in 1993 were either Black or Hispanic, while Whites comprise much the largest percentage of those convicted of offenses involving powder cocaine. Consequently, "the vast majority of those persons most affected by [the] exaggerated [sentencing] ratio are racial minorities." *Cocaine Report,* at 192. *See generally* Knoll D. Lowney, *Smoked Not Snorted: Is Racism Inherent in Our Crack Cocaine Laws?,* 45 Wash. U.J.Urb. & Contemp. L. 121 (1994) (collecting and explaining the statistical data that demonstrates the severely disproportionate impact that enhanced penalties for crack have on Blacks and Hispanics).

Largely on the basis of the findings in its report to Congress, the Sentencing Commis-

---

and applying the laws that Congress passes, and striking down those that we conclude are unconstitutional." *Ante* at 466. The tradition of courts engaging in dialogue with legislatures is too well-established in this and other courts to disregard. *See, e.g., Computer Associates International, Inc. v. Altai, Inc.,* 982 F.2d 693, 712 (2d Cir.1992) (noting developments since initial congressional enactment and exhorting that "the resolution of this specific issue could benefit from further legislative investigation"); *Brock v.*

*Peabody Coal Co.,* 822 F.2d 1134, 1152–53 (D.C.Cir.1987) (Ginsburg, Ruth Bader, J., concurring) (urging that "Congressional attention to this matter may well be in order"); *see also Abele v. Markle,* 342 F.Supp. 800, 810–11 n. 18 (D.Conn.1972) (Newman, J., concurring) (explaining that, when factual developments have made a law's prior justification constitutionally invalid, it is up to the legislature to decide whether to advance another state interest in support of that law), *vacated,* 410 U.S. 951, 93 S.Ct. 1417, 35 L.Ed.2d 683 (1973).

sion has promulgated an amendment to the Sentencing Guidelines (to be effective November 1, 1995) that "equalizes sentences for offenses involving similar amounts of crack cocaine and powder cocaine." Amendments to the Sentencing Guidelines for United States Courts, 60 Fed.Reg. 25,074, 25,075–77 (May 10, 1995) (setting forth text of, and reasons for, proposed amendment to the Guidelines' Drug Quantity Table, U.S.S.G. § 2D1.1). On the same grounds, the Sentencing Commission has recommended "that Congress eliminate the differential treatment of crack and powder cocaine in the mandatory minimum penalties found in current statutes." *Id.* at 25,076; *see also Cocaine Report,* at 198–200.

All this might change the constitutional status of the current ratio. If Congress, for example, though it was made aware of both the dramatically disparate impact among minority groups of enhanced crack penalties and of the limited evidence supporting such enhanced penalties, were nevertheless to act affirmatively and negate the Commission's proposed amendments to the Sentencing Guidelines (or perhaps were even just to allow the 100–to–1 ratio to persist in mandatory minimum sentences), subsequent equal protection challenges based on claims of discriminatory purpose might well lie. And such challenges would not be precluded by prior holdings that Congress and the Sentencing Commission had not originally acted with discriminatory intent. As the Supreme Court has pointed out, facially-neutral legislation violates equal protection if there is evidence that the legislature has "selected *or reaffirmed* a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Administrator of Massachusetts v. Feeney,* 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979) (emphasis added).

Even if the new data were not considered sufficient to make out a case of purposeful discrimination under *Washington v. Davis,* it might nonetheless serve to support a claim of irrationality. Judges and commentators have noted that the usually deferential "rational basis" test has been applied with greater rigor in some contexts, particularly those in which courts have had reason to be concerned about possible discrimination. *See City of Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 458–60 & n. 4, 105 S.Ct. 3249, 3264–65 & n. 4, 87 L.Ed.2d 313 (1985) (Marshall, J., concurring in part and dissenting in part) (detailing cases involving different levels of "rational basis" review); Laurence H. Tribe, *American Constitutional Law,* § 16–3, at 1443–1445 (2d ed. 1988) (noting areas in which "the 'rational basis' standard ... took on a new, more penetrating character"). *Cf. State v. Russell,* 477 N.W.2d 886, 889 (Minn.1991) (utilizing a "stricter standard of rational basis review ... where the challenged classification appears to impose a substantially disproportionate burden on the very class of persons whose history inspired the principles of equal protection"). *See generally* Matthew F. Leitman, *A Proposed Standard of Equal Protection Review for Classifications within the Criminal Justice System That Have a Racially Disparate Impact: A Case Study of the Federal Sentencing Guidelines' Classification Between Crack and Powder Cocaine,* 25 U.Tol.L.Rev. 215 (1994) (arguing that "courts should apply active rational basis scrutiny to criminal laws that have a racially disparate impact," and particularly "to the crack-powder classification").

It is not, however, easy for courts to step in and say that what was rational in the past has been made irrational by the passage of time, change of circumstances, or the availability of new knowledge. Nor should it be. Too many issues of line drawing make such judicial decisions hazardous. Precisely at what point does a court say that what once made sense no longer has any rational basis? What degree of legislative action, or of conscious inaction, is needed when that (uncertain) point is reached? These difficulties— and many others—counsel restraint, and do so powerfully.

In exercising restraint American courts might nonetheless take note of what the Constitutional Courts of some cognate countries have done in like situations. Both the Constitutional Courts of Germany and Italy have addressed the problem of laws that were

rational when enacted, but which, over time, have become increasingly dubious. Rather than jumping in and striking the laws down, or leaving them undisturbed and thereby allowing legislative inertia to dominate, these Courts have found a middle ground. They have, in a few cases, announced that laws, because of changed circumstances, were heading toward unconstitutionality. *See, e.g.,* Christian Pestalozza, *Verfassungsprozessrecht: die Verfassungsgerichtsbarkeit des Bundes und der Lander: mit einem Anhang zum Internationalen Rechtsschutz* § 20, at 337 & n. 313 (1991) (describing German practice and citing cases); *see also* Donald P. Kommers, *The Constitutional Jurisprudence of the Federal Republic of Germany* 60–61 & n. 118 (1989) (chronicling cases and explaining that the Constitutional Court of Germany utilizes this technique most often for "equal-protection claims ... to give the legislature time to adjust to changing conditions"). In this way, the continental Courts have put their parliaments on notice that a serious and thoughtful legislative review and reconsideration was in order and that failure to undertake such a review might in time result in judicial action and perhaps even nullification of the laws.

This approach—whose intellectual origins can be found in the work of the great American constitutionalist, Alexander Bickel, who himself found many examples of similar "mediating techniques" in the decisions of U.S. courts, *see* Alexander M. Bickel, *The Least Dangerous Branch* 111–98 (1986); Alexander M. Bickel, *The Supreme Court, 1960 Term—Foreword: The Passive Virtues*, 75 Harv.L.Rev. 40 (1961)—might be appropriate in future iterations of issues like the one before us today. It is at least worth thinking about. Is the new data enough to say that the extreme distinctions made between crack and cocaine are irrational? Is it enough to say that positive action to re-institute these distinctions (or even inaction leaving them in place) bespeak a discriminatory motive? Perhaps, but then again, perhaps not. Is it enough so that Constitutional Courts, properly troubled by them, should suggest to the legislature that "sober reconsideration" by elected representatives of the people is desirable? That is quite another matter. *See*

Alexander M. Bickel & Harry H. Wellington, *Legislative Purpose and the Judicial Process: The Lincoln Mills Case,* 71 Harv. L.Rev. 1, 34 (1957).

At one time, America had a virtual monopoly on constitutional judicial review, and if a doctrine or approach was not tried out here, there was no place else to look. That situation no longer holds. Since World War II, many countries have adopted forms of judicial review, which—though different from ours in many particulars—unmistakably draw their origin and inspiration from American constitutional theory and practice. *See generally* Mauro Cappelletti, *The Judicial Process in Comparative Perspective* (1989). These countries are our "constitutional offspring" and how they have dealt with problems analogous to ours can be very useful to us when we face difficult constitutional issues. Wise parents do not hesitate to learn from their children.