GUIDO CALABRESI, Circuit Judge,
concurring:
I believe the per curiam opinion accurately describes U.S. law and that of our circuit, so I join it fully. That is, its treatment of the effect of a change in law on previously imposed sentences in the absence of a clear statement of retroactivity is the normal — and normally appropriate — procedure and leads to the result in this case. And, yet, there is something troubling about this result with regard to a statute whose grossly different treatment of chemically identical drugs — the rock and powder forms of cocaine — has been criticized and questioned, particularly on grounds of racial injustice. E.g., U.S. Sentencing Comm’n, Special Report to Congress: Cocaine and Federal Sentencing Policy 192 (1995) (concluding that “the vast majority of those persons most affected by such an exaggerated ratio are racial minorities,” which creates a perception — if not a reality — of injustice). As we have learned more about the drugs’ similarities in terms of effect and addictiveness and about the racially disparate impact the statute’s mandatory minimum provisions have had, these criticisms have intensified. See, e.g., ACLU, With the Stroke of a Pen, a Fairer Criminal Justice System, Aug. 3, 2010 (calling the crack-powder disparity “one of the most dysfunctional and needlessly cruel aspects of the federal criminal justice system”).
European courts have developed a way of dealing with statutes that though valid when enacted, come, over time, to raise significant constitutional questions. These courts have engaged in a dialogue with their legislatures, explaining that though the courts were not prepared — or possibly even able — to say that the statute was unconstitutional, nevertheless, it was the court’s role to inform the legislature that the statute was “heading towards unconstitutionality.” Not surprisingly, in such situations, it sometimes happens that the legislature responds to cure the rising defects in the statute. See United States v. Then, 56 F.3d 464, 468-69 (2d Cir.1995) (Calabresi, J., concurring) (explaining this process).
One could describe the crack-powder disparity in the same way. The dialogue here has involved not just courts but the Sentencing Commission, the academy, and the press. See, e.g., U.S. Sentencing Comm’n, Special Report to Congress: Cocaine and Federal Sentencing Policy (1995, 1997, 2007) (recommending reducing or eliminating the crack-powder disparity); Steven L. Chanenson, Booker on Crack: Sentencing’s Latest Gordian Knot, 15 Cor *204 nell J.L. & Pub. Pol’y 551, 583-86 (2006) (describing the difficulties and disparities in the crack sentencing Guidelines and urging Congress to act); Editorial, Bad Science and Bad Policy, N.Y. Times, at A30 (Mar. 2, 2010).
To the extent that one could have viewed what occurred in Congress as a response to a suggestion by courts that the sentencing statutes were heading towards unconstitutionality, one might question whether the traditional presumption against retroactivity should apply. In circumstances where the legislature has responded to a judicial suggestion of unconstitutionality, the appropriate starting point might well be the opposite: to assume that the change reaches back — at the very least to cover cases pending on appeal at the time of enactment (and perhaps further) — in the absence of a specific statement that some other metric should be used. The import of this shift in presumption would be to force Congress to focus specifically on the impact of a legislative change resolving a potential constitutional problem, a focus that is not necessary in the run-of-the-mill situation where no countervailing constitutional-level values suggest that a statute’s official “effective date” and its practical application date should be different. If the statute’s validity was becoming dubious, why should we assume that the legislature wished the statute’s constitutional dubiousness to apply in any case?
Nonetheless, U.S. courts have failed to adopt this European dialogic approach. Indeed, with regard to the very question of the crack-powder disparity, it has been rejected by our circuit. Then, 56 F.3d at 466 (majority opinion). In Then, the majority expressly declined to adopt this technique.[1] I believe they were wrong then and that following this approach would be desirable now. But, I am bound by that decision and cannot argue that this case should be treated differently from the standard presumption.

. An ongoing debate exists on the propriety and desirability of U.S. courts learning from what foreign courts are doing in general and especially in constitutional matters. See generally David J. Seipp, Our Law, Their Law, History, and the Citation of Foreign Law, 86 B.U. L.Rev. 1417 (2006) (describing this debate); see also Justices Antonin Scalia & Stephen Breyer, Discussion at the American University Washington College of Law: Constitutional Relevance of Foreign Court Decisions (Jan. 13, 2005) (engaging in this debate). Whatever one's views are on this issue when it deals with reliance on foreign courts with regard to the import of substantive values, see, e.g., Roper v. Simmons, 543 U.S. 551, 624-28, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) (Scalia, J., dissenting) (admonishing the Court for looking to foreign nations' application of the juvenile death penalty), that is very different from what is involved in this case — whether doctrinal approaches, interpretative methods, and judging techniques for considering constitutional questions that have been developed abroad might be of use to us here. And it is important to realize that one could decline to consider the former but nonetheless adopt the latter as insightful or useful. See, e.g., Steven G. Calabresi, Importing Constitutional Norms from a “Wider Civilization": Lawrence and the Rehnquist Court's Use of Foreign and International Law in Domestic Constitutional Interpretation, 65 Ohio St. L.J. 1283, 1288-97 (2004) (comparing expository, empirical, and substantive uses of foreign law and approving of the first two while disapproving of the third).